*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

ESTATE OF TRASK SIMPSON, by SCOTT
SIMPSON, Personal Representative,

          Plaintiff-Appellee/Cross-Appellant,

v

GENERAL MOTORS, LLC, formerly known as
GENERAL MOTORS COMPANY, formerly
known as MOTORS LIQUIDATION COMPANY,
formerly known as GENERAL MOTORS
CORPORATION, GONZALEZ INTEGRATED
MARKETING, doing business as GONZALEZ
DESIGN GROUP, GONZALEZ DESIGN
ENGINEERING, doing business as GONZALEZ
DESIGN GROUP, GONZALEZ TECHNICAL
SERVICES, doing business as GONZALEZ
DESIGN GROUP, GONZALEZ MFG
TECHNOLOGIES, doing business as
GONZALEZ DESIGN GROUP, GONZALEZ
PRODUCTIONS SYSTEMS, doing business as
GONZALEZ DESIGN GROUP, and GONZALEZ
CONTRACT SERVICES, doing business as
GONZALEZ DESIGN GROUP,

          Defendants,

and

JWF TECHNOLOGIES, LLC, doing business as
JWF CONTAINER TECH, and KEENER
CORPORATION,

          Defendants-Cross-Appellees,

and

UNPUBLISHED
January 2, 2020

No. 341961
Genesee Circuit Court
LC No. 16-107103-NO

STABILUS, INC.,

        Defendant/Cross-Defendant-
        Appellant/Cross-Appellee,

and

ZF NORTH AMERICA, INC.,

        Defendant/Cross-Plaintiff.

---

ESTATE OF TRASK SIMPSON, by SCOTT
SIMPSON, Personal Representative,

        Plaintiff-Appellee/Cross-Appellant,

v

GENERAL MOTORS, LLC, formerly known as
GENERAL MOTORS COMPANY, formerly
known as MOTORS LIQUIDATION COMPANY,
formerly known as GENERAL MOTORS
CORPORATION, GONZALEZ INTEGRATED
MARKETING, doing business as GONZALEZ
DESIGN GROUP, GONZALEZ DESIGN
ENGINEERING, doing business as GONZALEZ
DESIGN GROUP, GONZALEZ TECHNICAL
SERVICES, doing business as GONZALEZ
DESIGN GROUP, GONZALEZ MFG
TECHNOLOGIES, doing business as
GONZALEZ DESIGN GROUP, GONZALEZ
PRODUCTIONS SYSTEMS, doing business as
GONZALEZ DESIGN GROUP, and GONZALEZ
CONTRACT SERVICES, doing business as
GONZALEZ DESIGN GROUP,

        Defendants,

and

JWF TECHNOLOGIES, LLC, doing business as
JWF CONTAINER TECH,

        Defendant-Appellant/Cross-
        Appellee,

No.  342291
Genesee Circuit Court
LC No.  16-107103-NO

and

KEENER CORPORATION,

        Defendant-Cross-Appellee,

and

STABILUS, INC.,

        Defendant/Cross-Defendant-Cross-
        Appellee,

and

ZF NORTH AMERICA, INC.,

        Defendant/Cross-Plaintiff.

---

Before:  M. J. KELLY, P.J., and MARKEY and GLEICHER, JJ.

PER CURIAM.

This product liability action arises from the explosion of a gas spring.  The spring was attached to the sidewall of a large metal rack owned by General Motors.  GM used the rack to store and transport auto parts.  Plaintiff Trask Simpson was severely injured when the gas spring violently separated as he raised the sidewall so that he could repair the rack's floor.  The cylinder section of the spring penetrated Simpson's face, lodging in his sinus cavity and brain.

Simpson claims that a manufacturing defect caused his accident.  A rivet inside the spring failed due to an inherent weakness, Simpson contends, resulting in the high-speed detonation of the device and his injury.  Simpson sued the spring manufacturer (defendant Stabilus, Inc.), the manufacturer of the rack (defendant Keener Corporation), GM, and several other entities involved the rack's design and distribution.

All defendants brought motions for summary disposition.  Some were granted, and some were denied.  We granted leave to consider a host of legal issues raised in the motions.  Simpson cross-appealed a ruling denying a discovery sanction, adding to the number of questions presented.

We affirm the circuit court's rulings as to defendant Stabilus and the discovery sanction, reverse as to defendants Keener and JWF, and remand for further proceedings consistent with this opinion.

I.  BACKGROUND FACTS

A.  THE RACK AND GAS SPRING

Trask Simpson was employed by Dort Steel as a welder.  Dort repaired or salvaged large metal racks in which GM stored and transported auto parts, such as bumpers.  Dort employees either fixed broken racks delivered by GM, or disassembled them for reuse of their parts.

The rack involved in this case was a large metal container that was open in the front, had two lateral walls called sidewalls, and a rear wall called a T-bar.  It arrived at Dort in a collapsed condition, with the three walls folded down to the rack's floor. The two sidewalls weighed approximately 90 pounds each.  Gas springs manufactured by Stabilus assisted in lifting them into position.  Once the two sidewalls were raised, the rear wall could be fastened in place.

Here is a photograph of the rack in the fully open position; the rear wall is in the foreground:



The inserts magnify the gas springs and the smaller red circles indicate their positions on the rack's sidewalls.

Gas springs are common, everyday products.  They are found on the tailgates and hoods of cars, where they facilitate the upward movement of heavy metal.  Underneath an office chair a gas spring dampens movement, preventing the seat from slamming down when someone sits on it.  Gas springs have different sizes, strengths, and uses, but they all work by storing and releasing energy.

Gas springs consist of two primary components: a rod and a cylinder. The spring depicted on the left in the above photo is the spring that exploded; only the rod end remained in place. The spring on the right is fully extended, and both the rod and cylinder are intact.

-4-

A gas spring's function depends on a transfer of pressure within the spring itself. A metal tube, called the cylinder, holds pressurized nitrogen gas. A rod with a piston at the end fits into the cylinder. The rod end of the cylinder contains seals that glide along the rod and help guide it. As the spring is extended, motion of the piston along the rod allows the gas to flow from one end of the spring to the other. The pressure differential created by movement of the piston generates a force that helps raise a heavy object.

The piston's position on the rod is maintained by the seals and washers and, ultimately, by a single rivet. The rivet is at the center of plaintiff's claims in this case. According to plaintiff, the gas spring that injured Simpson separated because the rivet head failed. That failure, plaintiff posits, was due to a manufacturing defect. The rivet head in the spring that injured Simpson was a "bad apple," plaintiff maintains.

## B. THE ACCIDENT

When the rack in the photograph was delivered to Dort, Simpson inspected it and decided to spot-weld a portion of the floor. As he started to raise the left side-wall, the gas spring blew apart. Propelled by the high-pressure nitrogen gas, the cylinder flew through the air and lodged in Simpson's face, penetrating his sinus and brain. The rod end of the spring remained attached to the rack. Here is a radiologic image obtained at the hospital where Simpson was taken, showing the cylinder embedded in his head:



Simpson died in August 2018, five years after the accident.

Before his death, Simpson sued a number of entities that he alleged were involved in the manufacture, distribution, and use of the gas spring. Pertinent here, the defendants were: GM; Gonzalez Contract Services (the designer of the rack); Keener Corporation (the manufacturer of the rack); JWF Technologies (the supplier of the gas spring), and Stabilus, Inc. (the manufacturer of the gas spring). Simpson's claims sounded in negligence and product liability.

The parties engaged in extensive discovery. More than two dozen depositions were taken. Jointly, the parties performed testing on the cylinder end of the spring and on exemplar springs. Dort apparently lost or destroyed the rod end of the spring that injured Simpson. A

number of engineering experts provided depositions regarding the cause of the spring's separation.

The experts agreed (and Simpson does not contest) that the spring had been misused at GM before it arrived at Dort. Specifically, the evidence established that the spring had been overextended at least once, and possibly many times. According to several of the expert witnesses, overextension precipitated a failure of the rivet head. When Simpson began to raise the sidewall, the defective rivet head allowed an instantaneous transfer of high-pressure gas, violently pushing the two components of the spring apart. As Dr. Stephen Batzer, defendant Keener's engineering expert put it: "if the rivet fails and the other components of the piston assembly are then free on the . . . rod end, pressure inside of the cylinder will cause the cylinder and rod to separate under force, and if they're not captured by their mounting points there will be . . . a rocket."

All of the defendants brought motions for summary disposition under MCR 2.116(C)(10). Simpson orally moved the court to impose a discovery sanction against JWF arising from JWF's alleged failure to timely supplement its discovery responses. The circuit court granted summary disposition to Keener, but denied summary disposition to GM, Gonzalez, Stabilus, and JWF. The court also denied Simpson's discovery sanction motion. GM and Gonzalez have settled with Simpson. Stabilus and JWF now appeal by leave granted; Simpson cross-appeals the dismissal of Keener and the denial of sanctions.

We turn to a deeper discussion of the evidence and the claims on appeal, which we address party-by-party. Our review of the evidence conforms to the rules governing summary disposition. We have considered the circuit court's summary disposition decisions de novo by familiarizing ourselves with the pleadings, admissions, affidavits, and other record documentary evidence "in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial." *Walsh v Taylor*, 263 Mich App 618, 621; 689 NW2d 506 (2004). When the record has left open an issue on which reasonable minds could differ, we have concluded that a genuine issue of material fact exists, precluding summary disposition. *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). Our review has also been guided by the principle that "[e]ven where the evidentiary facts are undisputed, it is improper to decide the matter as one of law if a jury could draw conflicting inferences from the evidentiary facts and thereby reach differing conclusions as to ultimate facts." *Nichol v Billot*, 406 Mich 284, 301-302, 279 NW2d 761 (1979) (citations omitted).

## II. STABILUS

Stabilus manufactures a wide variety of gas springs of different lengths and pressures, and designed for use in diverse applications. Some are "off the shelf" products. Others, such as the spring involved in this case, are custom-made. According to James Kull, Stabilus's Director of Industrial Applications Engineering, the subject spring was "a custom product" manufactured for defendant JWF, with "a certain length, a certain stroke, a certain force, and end fitting connections."

Defendant Gonzalez designed the GM rack. The rack's design included two Stabilus springs, one mounted to each sidewall. A ball stud system (the "end fitting connections" referred

to by Kull) attached the springs to the sidewalls. The springs selected for incorporation in the GM racks were manufactured with a ball cup, also called a "socket," at each end. The ball cup was intended to couple with the ball stud—a spherical head on a shank, affixed to the rack. The ball studs used on the GM racks were selected by defendant Gonzalez, and conformed to Stabilus's specifications. Here are photographs depicting the ball stud and a ball socket system. From left to right, the first two photos show the socket; the second depicts the clip, discussed below. The third photo is of a ball socket. The photo at the bottom of the display shows a spring's socket attached to a ball stud:



Clips on the ball sockets helped keep the balls and cups together. According to Stabilus's instructions, before freeing the spring from its attachment points, the clips would first be removed with a screwdriver. The evidence supports that when Simpson began working on the rack, the clip on the left spring's ball socket had already been removed. Simpson denied having removed the clip. Nevertheless, the ball apparently remained within the ball cup until the spring separated.[1]

According to James Mattice, a forensic engineer retained by Dort, the spring blew apart due to a failure of the rivet head holding the piston components in place, likely precipitated by overextension of the spring: "I believe at some point the gas spring was loaded in tension or overextended which resulted in its failure. . . . I believe at some point, yes, the rivet failed." In Mattice's estimation, the rivet failure occurred before the rack arrived at Dort. Mattice tested four exemplar gas springs in his laboratory to determine the amount of force required to fail their rivet heads. His testing revealed that when extended in an axial direction, the rivet heads maintained their function until the load reached approximately 2,000 pounds. When the spring was overextended by .11 to .13 inches, its components would "start breaking up." C. Michael

---

[1] Plaintiff's claims against GM centered on the removal of the clip, which likely occurred before the rack reached Dort, and on GM's allegedly negligent overextension of the rack's sidewalls. According to plaintiff, GM workers had dragged the racks with fork-lift trucks, bending the left sidewall and damaging internal components of the spring.

Dickinson, an engineer retained by GM, agreed that the spring separated because "[t]he rivet apparently failed."

Glenn Akhavein, an engineering expert retained by Simpson, concurred that the rivet head's failure caused the spring to separate:

> This style of gas spring is held together by a rivet head, which had been damaged while at the GM facility due to over extension of the gas spring. When Mr. Simpson started lifting the left side rail the cylinder end of the gas spring (the end that rotates upwards while the side rail is lifted), came off of its ball stud and due to the damage that had taken place at GM it did not extend slowly but instead flew off with enough velocity to penetrate deeply into Mr. Simpson's head.

His testing of exemplar springs demonstrated that the rivet head held until at least 1,500 pounds of force were applied. To generate the force necessary to separate his exemplar springs, Akhavein pulled on them by attaching them to his Chevrolet Suburban vehicle.

James Kull, Stabilus's engineering representative, admitted that the evidence supported that the rivet head failed, and that this failure caused the spring to come apart. Kull explained that the rivet is the only part of the spring's inner workings that retains the piston components on the rod. According to Kull, the spring was designed so that the rivet head would *withstand* overextension. Kull testified that the ball stud is supposed to sheer before the rivet head fails, with the ball stud functioning as a "fuse." After examining a CT scan of the internal components of the failed spring, which displayed distortions of the washers holding the piston in place and an absence of the rivet head, Kull expounded:

> *A.* [T]he way we designed this is the ball stud is designed to sheer at a force much lower than this. So to apply a longitudinal load through the ball stud, you're going to break the ball stud prior to that, you know, just by our strength of materials. *So the ball stud will sheer before that in this type of connection.* We have a 10-millimeter ball stud on that metal connection. That is the, say, like the fuse or what would break before I would expect to see, you know, piston . . . incident.
>
> *Q.* Just for the record, there's a ball stud at the top of the gas spring and a ball stud at the bottom?
>
> *A.* Yes.
>
> *Q.* And if I understand what you're telling me is that, in the event that there's an excessive longitudinal force . . . like, force along the long axis of the spring.
>
> *A.* Exactly. Yes.
>
> *Q.* If we have excessive force on the long axis of the gas spring, the ball spring is intended to fail first?

-8-

*A*. That is correct, yes.

*Q*. And that would be where it's next down to the attachment point where you bolt it on to whatever you're attaching it to?

*A*. Exactly. Yes. [Emphasis added.]

In his 28 years with Stabilus, Kull asserted, he had never seen a gas spring separation like this one.

Dickinson, the engineer retained by GM, agreed that the ball stud was supposed to fail before the rivet head. In his view as well as Kull's, overextension of the spring should have tripped the ball stud connection. Had this happened, the spring would have fallen off the rack. "A 13-millimeter nominally grade-2 fastener [used in this case] is such that if you put a pure axial tensile load on the strut [spring], you will significantly deform and/or break the ball stud before you fail the internal components of the strut." He continued:

> First let me say my understanding is it's Mr. Kull's testimony that says the ball studs are to act as a fuse and that they should break prior to a separation failure of the strut. I believe that that's correct and I believe that this was probably designed that way, which makes the failure of the strut through whichever mechanism or combination even more mysterious because we didn't fail these ball studs, and to my knowledge there's nothing magical about the ball studs on the accident rack. They're just grade 2 HS135's or whatever, right? That's just garden variety grade-2 steel.

> If we had a high-load quasi-static potential load applied sufficient to fail the rack, the rivet head as it was done in the lab tests, . . . the ball studs would have failed or broken or bent before that.

He added, "So if you somehow put 1,000-pound highly dynamic load on that system, I would still expect the ball studs to go first."

Dickinson, too, tested exemplar springs and ball studs. His testing revealed that the ball studs began to exhibit signs of failure, including bending, when between 800 and 1,000 pounds of force was applied. Examination of photographs of the ball studs involved in Simpson's accident revealed no evidence of failure, however: "I would expect to see bending of that ball stud in those photos, and I don't. And you certainly don't see bending like that." He agreed that the rivet head in this case "would have failed below 800 pounds" if the overextension was purely axial "and all other things are out of play, there's no heating, there's no prior damage on the inside, there's no fatigue, crack growth that predated this . . . ." And based on his examination of the involved spring, Dickinson concluded that it was subjected to "primarily axial tension."

No evidence produced by any party suggested that the ball studs deformed or broke before the spring exploded. Instead, the evidence summarized above substantiates that the rivet head failed first. And according to Akhavein, "[i]f the rivet head doesn't fail you don't get separation between the two components." Had the rivet head continued to function despite the

overextension, "then it's going to act just like it always does; the ball stud breaks and from whatever position this is compressed, it's going to slowly expand." Further questioning reinforced this point:

> *Q*. Simply put, my question is this. What would have happened if the rivet head did not fail?
>
> *A*. The gas spring would have extended to its full extent and then stopped.
>
> *Q*. If the rivet head had not failed would there have been an injury to Trask?
>
> *A*. I don't believe so.

In Akhavein's view, either the spring was not designed with a strong enough rivet head, or it was "manufactured in a manner that resulted in a product that didn't meet design intent." As discussed in more detail below, plaintiff has elected to confine his claim against Stabilus to a manufacturing defect.

When discovery concluded, Stabilus moved for summary disposition, presenting three arguments. Stabilus first contended that as the manufacturer of a component part, it bore no responsibility "for the use of the gas spring within the application in question." Further, Stabilus asserted, the gas spring was misused. Under MCL 600.2947(2), Stabilus continued, it was not liable for the consequences of misuse unless the misuse was reasonably foreseeable. Here, Stabilus claimed, the misuse of the racks was unforeseeable. Stabilus also challenged plaintiff's defective design claim.

In response, plaintiff abandoned all previously pleaded design defect claims raised against Stabilus and limited his legal argument to "a manufacturing defect." The court denied Stabilus's initial motion. Following oral argument, the circuit court permitted Stabilus to refile its motion for summary disposition. In its renewed motion, Stabilus contended that no evidence supported that the gas spring was defectively manufactured.

At hearings conducted on the various defendants' motions for summary disposition, plaintiff's counsel declared:

> This is a products liability action and they are talking about alternative design, underlying design. There is nothing wrong with the design of this gas spring. It is a manufacturing defect. The gas spring did not comply to the design of the gas spring itself. As the defense counsel for Stabilus indicated, there is a design criteria of the gas spring in which the rivet will be stronger than the ball stud. So in other words, if there is going to be an overextension, the overextension will break the ball stem, but the rivet will stay in place. The reason that's the distinction is, that prevents an explosion. So, the issue again is not alternative design . . . .

Plaintiff disputed that Stabilus supplied merely a "component," highlighting that the spring was a completed product used in conjunction with another product. Counsel analogized, "Stabilus'[s]

-10-

claim of lacking responsibility for a component part is as if a manufacturer of a tire claims it has no liability for tire defects because it didn't know if it was going to be used on a Chevrolet or a Buick." Misuse of the spring was foreseeable, counsel urged.

The circuit court ruled that an issue of fact precluded summary disposition of plaintiff's defective manufacturing claim. As to the foreseeability of misuse of the spring, the court stated:

> Plaintiff argues that this misuse was clearly foreseeable because Stabilus had accounted for overextension and excess force on the gas spring in their design criteria. And if this safety mechanism that was meant to prevent harm came out of - - coming out of misuse failed, then it seems clear that Stabilus foresaw the misuse of the spring and designed it accordingly. So, I'm going to let a jury decide that and your motion is denied.

On appeal, Stabilus renews most of its arguments. We address each in turn.

## A. STABILUS'S LIABILITY AS COMPONENT MANUFACTURER

Stabilus asserts that it had "no duty arising from the application" of its spring in the completed rack, because Michigan law absolves a manufacturer of the responsibility to anticipate how its product might become potentially dangerous when incorporated into a unit designed and manufactured by a different entity. Further, Stabilus contends, plaintiff's experts did not offer any opinions supporting that the spring was defective independent from the ball stud. And because Keener paired the spring and the ball stud, it qualifies as the competed product manufacturer, not Stabilus.

We begin with Stabilus's argument that because it manufactured only the spring itself and not the ball stud, it cannot be held liable for Simpson's injury. Stabilus rests this argument on two cases: *Childress v Gresen Mfg Co*, 888 F2d 45 (CA 6, 1989), and *Jordan v Whiting Corp*, 49 Mich App 481; 212 NW2d 324 (1973), rev'd in part on other grounds 396 Mich 145; 240 NW2d 468 (1976). *Childress* and *Jordan* are readily distinguishable from this case. The Sixth Circuit's holding in *Childress* is limited to cases alleging defective *design*: "[U]nder Michigan law a component part supplier has no duty, independent of the completed product manufacturer, to analyze the design of the completed product which incorporates its *nondefective* component part." *Childress*, 888 F2d at 49 (emphasis added). Plaintiff has abandoned a defective design claim and rests its arguments instead on a claim of "defective manufacture" or breach of implied warranty. *Childress* is inapposite.

Nor is *Jordan* helpful to Stabilus. There, too, this Court limited a manufacturer's duty when the component parts its supplies were "not in and of themselves dangerous or defective[.]" *Jordan*, 49 Mich App at 486. Like *Childress*, the plaintiff's claims in *Jordan* did not involve an allegedly defective part. This is a critical distinction; neither case addresses the duty of a component manufacturer to produce a nondefective part. "Component manufacturers should be summarily dismissed from litigation if the component product is defect-free." Cardelli & Cardelli, *Product Liability Relief for Component Manufacturers*, 69 Mich BJ 812, 814 (1990). The opposite proposition is equally true and applies here: when evidence supports that a component harbors a dangerous defect, summary disposition is improper.

Moreover, Michigan's product liability act specifically recognizes that a component manufacturer may bear liability for a defectively manufactured product. The act, MCL 600.2945 *et seq*., defines a "product liability action" as "an action based on a legal or equitable theory of liability brought for the death of a person or for injury to a person or damage to property caused by or resulting from the production of a product." MCL 600.2945(h). A "product" "includes any and all component parts to a product." This language signals that the Legislature did not intend that component-part manufacturers would be exempt from tort liability based merely on their status as component-part manufacturers. Rather, the component-parts doctrine is a common-law defense applicable in certain product liability actions. It is not a form of blanket immunity for a defectively manufactured part that happens to have been integrated within a larger product.

Assuming that the component-parts doctrine remains viable despite the enactment of the product liability act, we highlight that it embodies a *policy* determination. At its core, this common-law concept holds that component manufacturers should not be required to obtain and review the design of a completed product to independently assess whether a component will function safely and as intended. "For example, to borrow the *Childress* facts, if a valve has many applications and is dangerous only when another company uses it in a log-splitter, then it is difficult to argue that the valve supplier 'created' the risk; rather, it appears that the manufacturer of the log-splitter did." Mansfield, *Reflections on Current Limits on Component and Raw Material Supplier Liability and the Proposed Third Restatement,* 84 Ky LJ 221, 240 (1996). But the doctrine has never been applied in a case resting on a defective manufacturing theory, and for good reason.

When a component has been defectively manufactured, its integration into a larger or more complex product should not automatically eliminate its manufacturer's liability. "[A] manufacturer of a component part clearly is liable for injuries caused by a component that was defective or unreasonably dangerous at the time it left the control of the manufacturer." *Davis v Komatsu America Indus Corp*, 42 SW3d 34, 42 (Tenn, 2001). The Wisconsin Supreme Court has explained that "[i]ntegration into another product does not shift responsibility from the manufacturer of a defective component to another party 'who [is] in no position to detect the hidden defect.' " *Godoy ex rel Gramling v EI du Pont de Nemours & Co*, 319 Wis 2d 91, 120-121; 768 NW2d 674 (2009), quoting *City of Franklin v Badger Ford Truck Sales, Inc*, 58 Wis 2d 641, 649-650; 207 NW2d 866 (1973). Logically, it follows that the component parts doctrine cannot apply in a case premised *solely* on a defective manufacturing claim.

Simpson was injured by the failure of the gas spring. Although the gas spring was a component of the rack, plaintiff's claims against Stabilus center on the injury "caused by or resulting from the production of" the gas spring itself. The rack did not fail; the spring did. A component manufacturer has no liability when the manufacturer of a completed product integrates the component in an unsafe or unforeseen manner. *Portelli v IR Constr Prods Co, Inc,* 218 Mich App 591, 603-604; 554 NW2d 591(1996). However, a component manufacturer is subject to liability when its "product," defined by the act to specifically include components, is incorporated in a foreseeable way and fails due to inherent defects. Here, the spring functioned separately from the rack and had a separate purpose. We discern no policy basis for imposing the component-parts doctrine to these facts.

Moreover, the evidence substantiates that Stabilus knew that its springs could be used in applications identical or substantially similar to the rack, and has raised no claim that the nature or characteristics of the spring were changed by its incorporation. Because plaintiff alleges that the spring itself was defective and evidence supports that claim, the component-parts doctrine does not absolve Stabilus of liability.

## B. EVIDENCE THAT THE SPRING WAS DEFECTIVE

Stabilus next posits that it cannot be held liable for any injury caused by the spring because "[p]laintiff's experts did not offer any opinion that the gas spring—independent from any ball stud—was defective." We do not interpret the law or the evidence in so limited a fashion.

Stabilus manufactured the spring at issue with sockets at both ends. Kull's testimony supports that Stabilus knew and intended that the spring would be coupled with ball studs. No evidence of record suggests that the ball studs used in this case were defective, or differed from the ball studs that Stabilus anticipated would be paired with its spring. Rather, Kull testified that "the way we designed [the gas spring] is the ball stud is designed to sheer at a force much lower than this . . . . So the ball stud will sheer before that in this type of connection." With regard to the specific spring involved here, Kull continued, "[w]e have a 10-millimeter ball stud on that metal connection. That is the, say, like the fuse or what would break before I would expect to see, you know, piston . . . incident." He clarified by concurring that "[i]f we have excessive force on the long axis of the gas spring, the ball stud is intended to fail first[.]" Based on this testimony, Akhavein opined that the rivet "did not meet design intent":

> *Q.* So if the design intent is not to have the rivet fail first but rather the ball stud, if you have a situation like this where the rivet head does fail first, do you have an opinion as to whether or not it has met the design criteria?
>
> *A.* Oh, this is about as straightforward it gets [sic]. It's supposed to act like this and it acted like this. It absolutely didn't meet the design criteria.
>
> *Q.* If it didn't meet the design criteria, do you have an opinion whether or not it was manufactured in a way that did not comply with the design criteria?
>
> *A.* If we are talking - - well, the end product was manufactured in a manner that resulted in a product that didn't meet design intent.

He later elucidated that this testimony meant that there was a manufacturing defect, "based upon the fact that it didn't meet the design intent."[2]

---

[2] Stabilus cites at length the deposition testimony of another of plaintiff's experts, John Lauhoff, for the proposition that the spring harbored no defects. Lauhoff is not a mechanical engineer, and was not offered by plaintiff as an expert in product design or manufacturing. Rather, his

This testimony creates a reasonable inference that the spring behaved in an unexpected and defective manner, as it broke apart despite that the cylinder also came loose from the ball stud. Stabilus accurately points out that when answering a different question posed during his 359-page deposition, Akhavein denied the existence of a manufacturing defect. We must view the evidence in the light most favorable to plaintiff, however, and when considered through that lens, Akhavein corrected his previous testimony when given an opportunity later in the deposition.

And we would find that plaintiff has established a question of fact regarding his defective manufacturing claim regardless of Akhavein's testimony. In *Holloway v Gen Motors Corp (On Rehearing)*, 403 Mich 614, 618; 271 NW2d 777 (1978), our Supreme Court held that "a plaintiff may establish by circumstantial as well as direct evidence that there was a defect in the product when it left the manufacturer." *Holloway* is analogous to this case. The issue presented there was "whether the ball joint assembly of" the plaintiff's car failed while the car was being driven, or after the car "hit a ditch and then a utility pole." *Id*. at 620. The evidence established that "the break in the ball joint assembly was fresh, metallurgically clean, and due to an impact failure." *Id*. at 624. This finding negated that the car had been improperly maintained or misused. The Supreme Court concluded, "We are left with a reasonable probability that something was inherently wrong with the ball joint assembly such that it was unable to withstand an impact it should have withstood." *Id*. at 625.

Here, multiple experts testified that the rivet head failed unexpectedly. Their testimony was based on meticulous examinations of the cylinder and its internal components. Several of the experts testified that despite overextension of the spring, according to Stabilus's design criteria the ball stud should have failed before the rivet head. Furthermore, the exemplar springs failed only after being subjected to an enormous amount of force, far more than could be generated by a worker raising or lowering a rack's sidewall.

Despite this evidence, Stabilus insists that plaintiff cannot pursue a claim for defective manufacture without presenting positive proof that the rivet defect was present when the spring left Stabilus's control. Again, we do not accept Stabilus's interpretation of the governing law.

A manufacturing defect claim focuses on whether a product deviated from its intended condition when placed in the stream of commerce. See *Prentis v Yale Mfg Co*, 421 Mich 670, 683; 365 NW2d 176 (1984) ("As a term of art, 'defective' gives little difficulty when something goes wrong in the manufacturing process and the product is not in its intended condition. In the case of a 'manufacturing defect,' the product may be evaluated against the manufacturer's own

---

area of expertise is workplace safety. He testified as plaintiff's primary expert witness against General Motors. In evaluating whether summary disposition should have been granted on Stabilus's behalf, we have considered the evidence in the light most favorable to plaintiff. Where Lauhoff disagreed with Akhavein (particularly regarding issues indisputably falling outside of Lauhoff's expertise) we have disregarded Lauhoff's testimony, as required under basic summary disposition principles.

production standards, as manifested by that manufacturer's other like products."). Stabilus contends that no evidence supports that the spring was defective when it was sold to JWF, and therefore plaintiff failed to establish a necessary element of a product liability claim under MCL 600.2946(2). In relevant part this subsection provides:

> In a product liability action brought against a manufacturer or seller for harm allegedly caused by a production defect, the manufacturer or seller is not liable unless the plaintiff establishes that the product was not reasonably safe at the time the specific unit of the product left the control of the manufacturer or seller and that, according to generally accepted production practices at the time the specific unit of the product left the control of the manufacturer or seller, a practical and technically feasible alternative production practice was available that would have prevented the harm without significantly impairing the usefulness or desirability of the product to users and without creating equal or greater risk of harm to others. . . .

Viewed in the light most favorable to plaintiff, a jury could reasonably conclude that when the spring left Stabilus's control, the rivet head was incapable of withstanding a foreseeable overextension of the spring. This evidence supports two reasonable and interrelated inferences. The first is that the defect was attributable to Stabilus's failure to manufacture the rivet head to its own specifications. Second, Kull's testimony that the ball stud was intended to function as a "fuse" supports a reasonable inference that the rivet head's failure occurred because it was not able to withstand a predictable force.

Plaintiff refers to this claim variously as one of "negligent manufacture" or breach of implied warranty. The two theories of liability are closely related, but not necessarily identical. See *Prentis*, 421 Mich at 692 ("We recognize that the negligence theory generally focuses on the defendant's conduct, requiring a showing that it was unreasonable, while warranty generally focuses upon the fitness of the product, irrespective of the defendant's conduct."); *Lagalo v Allied Corp*, 457 Mich 278, 287-288; 577 NW2d 462 (1998) ("The jury may have concluded that the implied warranty was not breached, in light of the period during which Mr. Lagalo could have obtained a second repair in safety; at the same time, the jury may have been satisfied that the failure of the product reflected a failure to manufacture the product in a reasonable manner."). In this case, regardless of the name plaintiff attached to the claim, Michigan law has long established that a manufacturer's sale of a defective product is actionable even absent specific evidence of negligence in the manufacturing process.

In *Caldwell v Fox*, 394 Mich 401; 231 NW2d 46 (1975), the plaintiff's vehicle was struck by a car driven by defendant Fox. Fox claimed that his brake system was defective; an automobile dealer and General Motors were added to the suit as third-party defendants. *Id*. at 405. The third-party complaint stated claims for negligence and breach of warranty. *Id*. at 406. The circuit court dismissed the claims against the third-party defendants finding " 'no proof of a manufacturing defect by the third-party defendant,' " and defendant Fox appealed a jury verdict holding him liable for the plaintiff's injuries. *Id*. The Supreme Court held that the circuit court erred by dismissing the third-party defendants, as circumstantial evidence supported that the brake system was defective when it left the third-party defendant's control. Immediately after the accident, Fox saw brake fluid on the fender wall, and discerned that the connection between

the master cylinder and the brake line was loose. *Id*. at 408. He later took the car to the dealership, where a general manager documented that the vehicle " 'became defective sometime between the delivery date . . . and the date of the accident.' " *Id*. at 409. Fox's testimony, the Supreme Court determined, supplied evidence of a brake system malfunction. More specificity was unnecessary, as "[i]t is within the province of the jury to infer the existence of a defective condition from circumstantial evidence alone; there is no requirement that the actual defect need be proven." *Id*. at 410. The Court additionally pointed out:

> The Foxes had purchased the car only five weeks before the accident and there was no evidence that the brake system had been tampered with prior to the accident. This evidence is sufficient for a jury to infer reasonably that the brakes were defective from the time they left the manufacturer. [*Id*. at 411.]

The Supreme Court's opinion in *Caldwell* preceded the adoption of the product liability act. But like other panels of this Court, we find that the act did not change the fundamental character of a manufacturing defect claim. In *Bouverette v Westinghouse Elec Corp*, 245 Mich App 391, 396; 628 NW2d 86 (2001), this Court characterized the salient issue in an implied warranty case predicated on a manufacturing defect as follows: "When a products liability action is premised on a breach of implied warranty of fitness, the plaintiff must prove that a defect existed at the time the product left the defendant's control, which is normally framed in terms of whether the product was reasonably fit for its intended, anticipated or reasonably foreseeable use." (Quotation marks and citations omitted.) Similarly, in *Kenkel v Stanley Works*, 256 Mich App 548, 558; 665 NW2d 490 (2003), this Court explained that "[a] demonstrable malfunction is generally clear evidence of a defect . . . . Additionally, it is within the province of the jury to infer the existence of a defective condition from circumstantial evidence alone . . . ." (Quotation marks and citation omitted, ellipses in original.)

The circumstantial evidence and expert testimony in this record create a question of fact regarding whether the rivet head was reasonably safe when it left Stabilus's control. No evidence supports that the rivet head had been altered or modified between the time it left Stabilus's control and the accident. Moreover, the rivet head was within a sealed steel compartment. "Where a failure is caused by a defect in a relatively inaccessible part integral to the structure of the automobile not generally required to be repaired, replaced or maintained, it may be reasonable, absent misuse, to infer that the defect is attributable to the manufacturer." *Holloway*, 403 Mich at 624. Several expert witnesses testified that the rivet head did not perform as anticipated based on the fact that it gave way despite that the spring also disconnected from the ball stud. Further, the evidence supported a reasonable inference that the spring's failure occurred under a load of substantially less than 1,200 pounds, as at that level of force, the ball studs would have deformed. The circuit court did not err by denying summary disposition on this ground.

## C. MISUSE

Stabilus finally contends that no evidence supports that the misuse of the spring, likely by GM employees, was foreseeable to Stabilus. Under the product liability act, "[a] manufacturer or seller is not liable in a product liability action for harm caused by misuse of a product unless the misuse was reasonably foreseeable. Whether there was misuse of a product and whether

-16-

misuse was reasonably foreseeable are legal issues to be resolved by the court." MCL 600.2947(2). The circuit court ruled on this issue as follows:

> Plaintiff argues that this misuse was clearly foreseeable because Stabilus had accounted for overextension and excess force on the gas spring in their design criteria. And if this safety mechanism that was meant to prevent harm came out of - - coming out of misuse failed, then *it seems clear that Stabilus foresaw the misuse of the spring and designed it accordingly.* So, I'm going to let a jury decide that and your motion is denied. [Emphasis added.]

Although the court's reference to "the jury" is somewhat confusing, Stabilus concedes in its brief on appeal that the circuit court concluded that the misuse was foreseeable. According to Stabilus, this was clear error for two reasons. First, Stabilus contends that the evidence simply does not support that overextension of the spring was foreseeable. Second, Stabilus points out, the circuit court apparently rendered its ruling under the mistaken belief that plaintiff's case centered on a design defect theory.

"Clear error exists when some evidence supports the circuit court's finding, but a review of the entire record leaves this Court with the definite and firm conviction that the circuit court made a mistake." *Hills & Dales Gen Hosp v Pantig*, 295 Mich App 14, 19; 812 NW2d 793 (2011). We reject Stabilus's argument that the record is devoid of evidence of the foreseeability of misuse. Kull's testimony supports that Stabilus knew that overextension of its gas spring could occur, and anticipated that the ball stud connection would fail before the rivet head did. Nor has Stabilus explained why the rivet head's failure was unforeseeable under defective manufacturing theory. The circuit court's ruling conformed with the evidence, and renders Stabilus's misuse arguments meritless.

## III. JWF

The circuit court also denied summary disposition to defendant JWF, and we granted leave to appeal. *Simpson v Gen Motors, LLC*, unpublished order of the Court of Appeals, entered March 8, 2018 (Docket No. 342291). JWF contends that because it did not design or manufacture the gas spring but merely supplied it to Keener for incorporation in the rack, it cannot be held liable for Simpson's injury. Further, JWF insists, GM's misuse of the rack negates any proximate cause.

Plaintiff contends that it need not prove that JWF was negligent. The gas spring left JWF with a defective part inside, plaintiff insists, and JWF placed that defective part into the stream of commerce. JWF acknowledged that the misuse of the spring through overextension was foreseeable. Therefore, plaintiff reasons, JWF also bears liability for the defectively manufactured spring.

The circuit court denied summary disposition to JWF based on evidence suggesting that JWF had conducted a simulation that assisted Gonzalez in the selection of the specific gas spring incorporated in the rack. This act, however, does not subject JWF to liability under a defective manufacturing theory.

MCL 600.2947(6) governs the liability of a nonmanufacturing seller in a breach of implied warranty case. This section of the product liability act provides:

> In a product liability action, a seller other than a manufacturer is not liable for harm allegedly caused by the product unless either of the following is true:
>
> (a) The seller failed to exercise reasonable care, including breach of any implied warranty, with respect to the product and that failure was a proximate cause of the person's injuries.
>
> (b) The seller made an express warranty as to the product, the product failed to conform to the warranty, and the failure to conform to the warranty was a proximate cause of the person's harm. [MCL 600.2947(6).]

In *Curry v Meijer, Inc*, 286 Mich App 586, 592; 780 NW2d 603 (2009), this Court held that in an action against a nonmanufacturing seller, the plain language of subsection (a) requires a plaintiff to present evidence of a failure to "exercise reasonable care." "While subsection (a) contains the clause, 'including breach of any implied warranty,'" the Court explained, "the grammatical context and placement of this clause indicate that the Legislature did not intend to create a third avenue of liability." *Id*. In other words, under this part of the product liability act, "a breach of implied warranty claim is a type of, and not separate from, a breach of reasonable care claim." *Id*. at 594.[3]

Plaintiff presented no evidence that JWF failed to exercise reasonable care. The essence of plaintiff's claim regarding the spring is that it harbored an intrinsic fault due to a manufacturing defect traceable to Stabilus. No evidence supports that JWF supplied an incorrect spring, or that JWF had reason to know that the spring was or might be defective. And plaintiff presented no evidence that JWF *negligently* participated in the decision-making process that resulted in the selection of the particular model of gas spring used in the GM rack. Even if we were to accept that JWF conducted the simulation negligently, plaintiff has not explained how that negligence proximately caused Simpson's injury Because this Court's decision in *Curry* controls plaintiff's claims against JWF, the circuit court erred in denying JWF's motion for summary disposition.

IV. KEENER

A. THE PROCEDURAL BACKGROUND

Defendant Keener, the manufacturer and seller of the completed rack, also sought summary disposition. Keener filed its motion under MCR 2.116(C)(10), asserting that no evidence supported a claim against it premised on theories of either defective design or defective manufacture. Plaintiff's response centered on those arguments. Plaintiff contended that because

---

[3] Plaintiff has not pursued a claim for express warranty against JWF, and therefore MCL 600.2947(6)(b) is inapplicable.

Keener was "the ultimate manufacturer," it could not avoid liability for the defective spring "under the Products Liability Statute or *Comstock*," and an "implied warranty" theory.

At the argument on Keener's motion, plaintiff's counsel stressed that "this is not a design defect case," but rather involved "manufacturing defects" and breach of implied warranty. Counsel added, "no comment was made about the breach of expressed warranty. There was an expressed warranty that this would be free of defect. It follows through to the plaintiff the expressed warranty that has been given." Keener's counsel did not offer a rejoinder to plaintiff's express warranty argument.

The circuit court articulated that "nobody showed that Keener designed or built a defective container."[4] Additionally, the circuit court ruled, the "three-year gap" between the rack's manufacture and the accident "is too great to say that it's Keener's problem, so they're out." The court reasoned:

> This particular rack was used for three years. And the testimony by the various witnesses says the damage to the container was not done by Keener. That's pretty important to this Court.
>
> And somewhere I read the *Davis [v] Link* case it says:
>
> "Where a mechanical die had been successfully used for five years without incident before injury, the risk of injury was unforeseeable as a matter of law."
>
> We had three years here. I think that same logic applies.

Plaintiff's counsel reminded the court of the express and implied warranty claims, and the court responded, "I don't care whether it was expressed or implied. Keener's motion is granted."

Keener submitted a proposed order dismissing the case against it in its entirety. Plaintiff objected to the order, asserting that Keener's summary disposition motion had not addressed the implied and express warranty claims. Therefore, plaintiff contended, the order should have dismissed only the claims brought under MCL 600.2946(2). Keener asserted that the order accurately recapitulated the court's oral ruling, and that plaintiff's motion actually sought reconsideration rather than correction of the proposed order. And plaintiff never pleaded claims of implied or express warranty, Keener claimed.

In response, plaintiff presented several pages of the second amended complaint invoking implied or express warranty claims. At the hearing, the court rejected plaintiff's arguments, stating, "The Court declares that it's [sic] intent was to remove Keener from this case in all respects." Plaintiff has cross-appealed this ruling.

---

[4] The parties also refer to the rack as "the container."

## B.  THE SECOND AMENDED COMPLAINT AND KEENER'S

## MOTION FOR SUMMARY DISPOSITION

Plaintiff's second amended complaint spanned 68 pages and set forth 353 numbered paragraphs.  The first 72 paragraphs fell under the heading "General Allegations."  The remaining paragraphs described additional claims against each individual defendant.  Relevant here are the following paragraphs applicable to all defendants:

57.    The Defendants breached its [sic] implied warranty with respect to the container.

58.    Upon information and belief, Defendants made an expressed warranty as to the container.

* * *

67.    The Defendants' [sic] breached its [sic] implied and/or expressed warranties regarding the frame and that such was a proximate cause of Plaintiff's injuries and damages as heretofore alleged.

* * *

72.    Plaintiff sustained injuries and damages which were a proximate result of:

* * *

e.  Defendants' breach of expressed and implied warranties.

## C.  ANALYSIS

Keener's motion for summary disposition did not mention plaintiff's express warranty theory.  Nor does the record reflect that Keener ever filed a motion under MCR 2.116(C)(8) or seeking a more definite statement related to plaintiff's warranty claims.  On appeal, plaintiff asserts that the circuit court improperly granted summary disposition of Simpson's express warranty claim because Keener's initial motion for summary disposition did not address it. Plaintiff is correct.

A complaint must contain "[a] statement of the facts, without repetition, on which the pleader relies in stating the cause of action, with the specific allegations necessary reasonably to inform the adverse party of the nature of the claims the adverse party is called on to defend . . . ." MCR 2.111(B)(1).  "[T]he primary function of a pleading in Michigan is to give notice of the nature of the claim or defense sufficient to permit the opposite party to take a responsive position." *Stanke v State Farm Mut Auto Ins Co*, 200 Mich App 307, 317; 503 NW2d 758 (1993), citing 1 Martin, Dean & Webster, Michigan Court Rules Practice, p 186.  Our Supreme Court has characterized MCR 2.111(B)(1) as consistent with a "notice pleading environment." *Roberts v Mecosta Co Gen Hosp (After Remand)*, 470 Mich 679, 700 n 17, 684 NW2d 711

(2004). "[N]otice pleading and key documents are typically sufficient to survive summary disposition under MCR 2.116(C)(8)," as the plaintiff will generally not have all the evidence available when filing the complaint. *Tomasik v Michigan*, 327 Mich App 660, 667; ___ NW2d ___ (2019). If a party fails to plead facts with sufficient detail, the court should permit "the filing of an amended complaint setting forth plaintiff's claims in more specific detail." *Rose v Wertheimer*, 11 Mich App 401, 407; 161 NW2d 406 (1968); see also MCR 2.116(I)(5).

Plaintiff's second amended complaint adequately set forth a claim for breach of an express warranty. In three different places in the complaint, plaintiff invoked an express warranty theory. While plaintiff's pleading regarding this theory was not particularly detailed or specific, it sufficed to afford Keener with notice that an express warranty claim would be pursued.

> What is required of pleadings in modern times is no more than reasonable notice of the claims made, in sufficient detail only that there be no misleading of either party nor a denial to him of information necessary to a fair preparation and presentation of his case. The pleader, in other words, need only apprize plainly the opposite party of the cause of action and the claim of plaintiff. [*Jean v Hall*, 364 Mich 434, 437; 111 NW2d 111 (1961) (quotation marks and citation omitted).]

Plaintiff's amended complaint fulfills these requirements.

Accordingly, the circuit court erred by granting summary disposition of plaintiff's express warranty claim. MCR 2.116(G)(4) provides that when seeking summary disposition, the moving party must "specifically identify the issues as to which the moving party believes there is no genuine issue as to any material fact." MCR 2.116(G)(3) compels the moving party to support its motion with affidavits, depositions, or admissions, or other documentary evidence. Only if the moving party complies with MCR 2.116(G)(3) does the burden shift to the opposing party to respond. *Barnard Mfg Co, Inc v Gates Performance Engineering, Inc*, 285 Mich App 362, 370; 775 NW2d 618 (2009).

Keener failed to present any argument or evidence supporting that plaintiff's express warranty claim lacked legal or factual merit. In an analogous case, *Al-Maliki v LaGrant*, 286 Mich App 483, 486; 781 NW2d 853 (2009), we highlighted that due process principles compel courts to let a party know that an otherwise unraised issue is on the table for a summary decision. In that case we noted that "the record clearly reveal[ed] that plaintiff had no notice that the causation issue would be raised at the summary disposition motion hearing and rightly should have been surprised by the circuit court's inquiry at the motion hearing regarding causation." *Id*. at 487. We concluded that "the basic requirements of notice and a meaningful opportunity to be heard" were unsatisfied, and reversed the grant of summary disposition. *Id*. at 488. Here, too defendant's summary disposition motion did not challenge one of plaintiff's pleaded claims and plaintiff should not have been required to defend that claim's validity at the hearing. MCR 2.116(G)(4).

Therefore, we must vacate the circuit court's order granting summary disposition of plaintiff's express warranty claim, and remand for further proceedings in this regard. If Keener

intends to seek summary disposition based on an express warranty theory, Keener must file an appropriate summary disposition motion under MCR 2.116(C)(10), identifying the legal issue on which it seeks summary disposition, and the evidence supporting its argument. To assist the court on remand, we provide the following guidance regarding plaintiff's express warranty claim.

Plaintiff asserts that Keener made an express warranty regarding the rack, specifically that it was "free from defect."[5] An express warranty is a representation by a manufacturer or a seller that a product has certain characteristics, or meets certain standards. See *Curby v Mastenbrook*, 288 Mich 676, 679-680; 286 NW 123 (1939). The product liability act provides that "a seller other than a manufacturer" may bear liability for harm caused by a product if "[t]he seller made an express warranty as to the product, the product failed to conform to the warranty, and the failure to conform to the warranty was a proximate cause of the person's harm." MCL 600.2947(6)(b). Assuming without deciding that Keener did, in fact, expressly warrant the fitness and suitability of the rack, the elements of plaintiff's claim for breach of the warranty include proximate causation: that the failure of the product to meet the express warranty was a proximate cause of plaintiff's injuries or damages. See M Civ JI 25.12.[6]

"Proximate causation involves examining the foreseeability of consequences and whether a defendant should be held legally responsible for such consequences[.]" *Jones v Detroit Med Ctr*, 490 Mich 960, 960; 806 NW2d 304 (2011). An injury is proximately caused by a breach of an express warranty if it is a "natural and probable consequence" of the breach, "which, under the circumstances, an ordinary prudent person ought reasonably to have foreseen might probably occur as the result of" the breach. *Nielsen v Henry H Stevens, Inc*, 368 Mich 216, 220-221; 118 NW2d 397 (1962). "The question of proximate cause is generally held to be one for the jury. Any doubts about the relations between the causes and the effects should be resolved by the jury. The determination of remoteness should seldom, if ever, be summarily determined." *Fiser v Ann Arbor*, 417 Mich 461, 475; 339 NW2d 413 (1983) (citations omitted), overruled on other grounds by *Robinson v Detroit*, 462 Mich 439, 613 NW2d 307 (2000). "Proximate cause is a question for the jury to decide unless reasonable minds could not differ regarding the issue." *Lockridge v Oakwood Hosp*, 285 Mich App 678, 684; 777 NW2d 511 (2009). "There may be more than one proximate cause of an injury." *Allen v Owens-Corning Fiberglas Corp*, 225 Mich App 397, 401; 571 NW2d 530 (1997).

In its summary disposition ruling, the circuit court conflated the foreseeability component of proximate cause with the discussion of foreseeability in *Davis v Link*, 195 Mich App 70; 489 NW2d 103 (1992). *Davis* was a negligence case and involved duty, not proximate cause. "Duty is essentially a question of whether the relationship between the actor and the injured person

---

[5] We take no position regarding whether Keener did, in fact, make this warranty. If raised by Keener, this is an issue to be decided by the circuit court.

[6] Privity of contract is not a prerequisite to an express warranty claim. *Bouverette*, 245 Mich App at 398.

-22-

gives rise to any legal obligation on the actor's part for the benefit of the injured person. Proximate cause encompasses a number of distinct problems including the limits of liability for foreseeable consequences." *Moning v Alfono*, 400 Mich 425, 438-439; 254 NW2d 759 (1977).

The plaintiff in *Davis* was a punch press operator employed at the Whirlpool Corporation and was injured when her hand was caught in the press's pinch point. She brought a product liability claim against the manufacturer of the die used in the press, alleging a failure to design and manufacture the die with sufficient pinch point guarding. *Davis*, 195 Mich App at 71. "There [was] no allegation that the die itself was defectively designed or manufactured." *Id*.

This Court affirmed a grant of summary disposition premised on *duty*, and not proximate cause. Citing *Fredericks v Gen Motors Corp*, 411 Mich 712, 720; 311 NW2d 725 (1981), we held: "The supplier of a die set to a component manufacturer does not have a duty to place guards on the die set or warn the component manufacturer of hazards attendant in its use." *Davis*, 195 Mich App at 72. The plaintiff argued that despite *Fredericks*, her employer had a statutory duty to maintain workplace safety, and that the die manufacturer should have known that the die would be used in an unsafe manner. We rejected that argument because the plaintiff "failed to present evidence of the manufacturer's knowledge of unsafe use, and no evidence was presented that unsafe use was foreseeable." *Id*. Furthermore, "the evidence revealed that the die had been successfully used in the press for four or five years without incident before plaintiff's injury." *Id*. Based on these facts, we held that the plaintiff had not established the duty element of a prima facie case. *Id*. at 73.

Assuming that an express warranty exists here, duty will not constitute a contested element of plaintiff's prima facie case. "The primary questions in express warranty claims are whether the communication is a warranty, whether its scope covered the characteristic that caused injury, whether it was breached, whether the plaintiff relied, and what harm resulted because the warranty was breached." 2 Dobbs, Hayden & Bublick, Torts (2d ed), § 452, pp 904-905. Dobbs continues, "The fact that the product is not defectively designed or manufactured is irrelevant; the 'defect' at issue is its failure to meet the standards expressed in the warranty or representation itself." *Id*. at 905. See also *Moning*, 400 Mich at 439 ("It is well established that placing a product on the market creates the requisite relationship between a manufacturer, wholesaler and retailer and persons affected by use of the product giving rise to a legal obligation or duty to the persons so affected.").

Foreseeability comes into play in the sense that plaintiff must establish at trial that Keener's breach of its warranty was a proximate cause of Trask Simpson's injury. See MCL 600.2947(6)(b) ("[T]he failure to conform to the warranty was a proximate cause of the person's harm."). Foreseeability is one aspect of proximate cause, including whether Simpson was "within the foreseeable scope of the risk" created by a breached warranty. See *Moning*, 400 Mich at 439. And it has long been the law in this state that "[a] plaintiff need not establish that the mechanism of injury was foreseeable or anticipated in specific detail. It is only necessary that the evidence establishes that some injury to the defendant was foreseeable or to be anticipated." *Schultz v Consumers Power Co*, 443 Mich 445, 452-453 n 7; 506 NW2d 175

(1993).[7]  If on remand Keener brings a summary disposition motion based on express warranty, we instruct the circuit court to consider these legal precepts.

## V.  PLAINTIFF'S CROSS-APPEAL

By way of reminder, JWF supplied the Stabilus springs used in the rack that ended up at Dort.  Plaintiff claims that JWF used a software analysis program to determine which gas springs should be incorporated in the rack, as well as the number of springs, their mounting locations, and their fastening mechanisms.  The evidence supports that Stabilus manufactured the springs used in the GM racks to JWF's specifications.  Gonzalez's design of the rack contemplated that each sidewall would be raised with one Stabilus spring.

According to the deposition testimony of Dominick DiPilla, JWF's president and owner, JWF functioned like a "hardware store" with regard to the GM racks, supplying "off the shelf" springs identified by the customer.  In a motion for summary disposition JWF averred that it was merely a distributor of the gas spring, and did not manufacture or design the rack.  Plaintiff countered with evidence suggesting that JWF played a far more active role in the rack's design.

Shortly before a scheduled trial date, defendant JWF served plaintiff with documents that it characterized as supplemental discovery.  Within those documents was an email authored by Ralph Burns, a JWF salesman, responding to an email sent by Tom Clos, an employee of Gonzalez.  Clos asked Burns to address "item 9," which apparently was a question posed in an email sent by a GM employee.  In any case, Burns replied, "By respond, so you mean . . . . [sic] remind them that I recommended using two gas springs?"

Soon after JWF produced this email and at a hearing conducted on another subject, counsel for Simpson vigorously contended that the email should be considered inadmissible due to its delayed disclosure.  The circuit court permitted the parties time to respond in writing.  Before the next hearing, counsel filed a notice indicating that plaintiff would seek a "default" based on JWF's belated production of the email.  At the hearing, however, Simpson's counsel conceded that a default "would be too serious."  The court indicated that it would not enter a

---

[7] If the court determines that an express warranty exists, it must then consider whether Keener breached the express warranty, and whether the breach was a proximate cause of plaintiff's injuries and damages.  We note that some evidence of record supports that overextension of the rack's sidewalls was foreseeable.  For example, Mattice testified that the rack's design features "may lead to a possible overextension of the gas spring when the sidewall is lifted, put in a vertical position," and that "pushing the sidewall outward could possibly overextend" the spring, "elongat[ing]" it.  Whether this evidence and similar testimony suffices to establish that Simpson's injury was a foreseeable consequence of Keener's breach of an express warranty is a question for the circuit court.  We note that without further elaboration by the circuit court, the length of time that the rack was used, standing alone, does not render Simpson's injury unforeseeable under a breach of warranty theory.

default. On appeal, plaintiff asserts that the circuit court erred by refusing to enter a default or other sanction against JWF arising from its "withholding" of evidence.

We agree with plaintiff that the email fell within the scope of plaintiff's earlier discovery requests, and should have been produced. Nevertheless, we discern no basis to sanction JWF for this omission with the entry of a default.

A multitude of engineering experts were consulted by the parties. And the parties' interests were markedly adverse to each other. For example, GM's expert supplied testimony inculpating Stabilus; other defense experts pointed the proverbial finger at GM. None of the engineers opined that the *rack* was defectively designed, or that two springs should have been used. In other words, none of the testimony inculpated JWF. This omission is particularly notable because an initial concept drawing produced by GM *did* depict a rack with two springs on each sidewall. The two-spring theory was neither concealed nor impossible to develop even absent the Burns email. And at this point, the question borders on being moot, as we have held that JWF must be dismissed as a party to this lawsuit.

Given the expert testimony, we question whether the Burns email is relevant on remand. We leave this determination to the circuit court.

## VI. SUMMARY

We affirm the circuit court's orders denying summary disposition to Stabilus and denying plaintiff's motion for sanctions against JWF. We reverse the circuit court's order granting summary disposition to Keener. Plaintiff may proceed against Keener on an express warranty theory; the circuit court in its discretion may entertain a motion for summary disposition regarding this claim. We reverse the circuit court's order denying summary disposition to JWF. We award no costs to any party, and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Michael J. Kelly
/s/ Jane E. Markey
/s/ Elizabeth L. Gleicher